# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| SAINT-GOBAIN AUTOVER USA, INC., et al., | ) ) ) | CASE NO.  1:06CV2781 |
| PLAINTIFFS, | ) ) | JUDGE SARA LIOI |
| vs. | ) ) ) | MEMORANDUM OPINION |
| XINYI GLASS NORTH AMERICA, INC., et al., | ) ) ) ) | |
| DEFENDANTS. | ) | |

This matter is before the Court on the motion of Plaintiffs Saint Gobain Autover USA, Inc., Saint Gobain Sekurit Mexico, S.A., DE C.V., and Saint Gobain Sekurit USA ("Plaintiffs" or "Saint Gobain") for enhanced damages, attorney's fees, and prejudgment interest. (Doc. No. 224.) In addition to opposing Saint Gobain's motion, Defendants Xinyi Glass North America, Inc. and Xinya Automobile Glass Co., Ltd. ("Defendants" or "Xinyi") have moved for oral argument on Saint Gobain's motion. (Doc. No. 230.) Saint Gobain has moved to strike Xinyi's motion. (Doc. No. 236.)

## BACKGROUND

The factual and procedural history surrounding this case has been set forth in previous decisions, most recently in the Court's October 12, 2009 Memorandum Opinion, familiarity with which is presumed. For purposes of framing the issues raised by Saint Gobain's motion for enhanced damages, it is sufficient to note that Plaintiffs are the patent holders of the '395 and '669 patents, which both relate generally to glazings, i.e.,

windshields, for installation in motor vehicles.[1] The '395 patent is entitled "Method of Centering Windshields Glazings," and discloses and claims a method of centering a glazing upon a mounting bracket. The '669 patent, entitled "Spacer for Windshield Bracket," discloses and claims a glazing with at least one profiled spacer with a lip portion projecting beyond the periphery of the glazing.

On November 16, 2006, Saint Gobain brought suit against Xinyi, alleging patent infringement, and seeking an injunction against continued infringement, damages for past infringement, treble damages for willful infringement, and attorney's fees and costs. (Doc. No. 9, Am. Compl. at 3.) Following a hearing on claim construction, and consideration of both pre- and post-hearing briefs from the parties, the Court announced its construction of the claims. Specifically, the Court found that the term "centering" and its related terms did not require construction, while the term "aligning" merited construction and related to the process of ensuring "a uniform distance between the bracket and the glazing along a contact surface of the spacer." (Doc. No. 118, Memo. Op. at 10-13, 22-23.)

Xinyi subsequently sought summary judgment, and offered as defenses non-infringement, obviousness, and non-enablement. Both sides filed motions in limine to block from the Court's consideration various defenses, arguments, and evidence. In a decision dated October 12, 2009, the Court denied Xinyi's summary judgment motion *in toto*. In so ruling, the Court granted Saint Gobain's motion to strike Xinyi's obviousness defense on the ground that Xinyi had failed to seasonably supplement its discovery responses to provide information regarding this defense in violation of Fed. R. Civ. P.

---

[1] The '395 patent was a reissue patent that traced its roots to a prior patent, the '979 patent.

26(e). (Doc. No. 163, Mem. Op at 8-9.) While the Court also found that Xinyi had failed to provide discovery as to the defense of non-enablement, and failed to properly plead the defense in its answer, the Court permitted Xinyi to maintain the defense upon a finding that Saint Gobain had not been prejudiced by the omissions.[2] Further, in denying summary judgment, the Court found that the parties' dueling experts on the subjects of non-infringement and non-enablement precluded a grant of summary judgment in favor of Xinyi. (*Id*. at 21-22, 23-24, 30-31.)

Beginning November 2, 2009, the Court presided over a seven-day jury trial. On November 10, 2009, the Court granted Saint Gobain's motion for judgment as a matter of law on Xinyi's non-enablement defense, finding that Xinyi's expert, Samuel Phillips, was not qualified to render a decision on non-enablement, and Xinyi failed to otherwise provide any support for this defense. (TR at 1885.) At the trial's conclusion, the jury returned a verdict in favor of Plaintiff on the issue of infringement, and awarded $10,896,558.00 in compensatory damages. (TR at 2000.) The jury also found that Saint Gobain had proven its right to a reasonable royalty, and awarded $47,457.00 in royalty damages, for a total damage award of $10,944,015.00. (TR at 2002.) Finally, the jury found that Xinyi willfully infringed both the '395 and the '669 patents. (TR at 2003.)

Plaintiffs have now moved for enhanced damages and prejudgment interest, under 35 U.S.C. § 294, and attorney's fees, under 35 U.S.C. § 285. According to Plaintiffs, treble damages are appropriate because "Xinyi's overall conduct warrants the

---

[2] In particular, the Court found that allowing the defense of non-enablement to continue to trial would not prejudice Saint Gobain inasmuch as Saint Gobain had secured its own expert on the subject of non-enablement and was able to offer expert evidence in opposition to Xinyi's affirmative defense. (*Id*. at 13.)

maximum allowable increase in damages." (Doc. No. 224, Mot. at 5.) Plaintiffs also argue that this is such an "exceptional" case, under 35 U.S.C. § 285, that the award of attorney's fees is appropriate. Xinyi opposes any enhancement to the jury's award, and, in fact, urges the Court to set aside the jury's finding of willfulness.

**APPLICABLE LAW**

Upon a finding of infringement, 35 U.S.C. § 284 requires a court to award "damages adequate to compensate for the infringement." The same section gives a court discretion to increase the damages up to three times the amount awarded by the fact finder. *Id.*

The Federal Circuit announced a new standard for willfulness in *In re Seagate Tech., LLC:* "proof of willful infringement permitting enhanced damages requires at least a show of objective recklessness." *In re Seagate Tech.*, 497 F.3d 1360, 1371 (Fed. Cir. 2007). Under this standard, "to establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent. *Id.* If this threshold showing is made, "the patentee must also demonstrate that this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer." *Id.* This "objective recklessness" standard represented a marked departure from the traditional standard, which imposed an affirmative duty of care on potential infringers to determine whether their conduct was infringing if they had notice of another party's patent rights. *Contra United Water Devices, Inc. Morrison-Knudsen Co.*, 717 F.2d 1380, 1389-1390 (Fed. Cir. 1983).

4

In *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 827 (Fed. Cir. 1992), the Federal Circuit identified nine factors that were to guide a trial court's enhancement analysis: (1) whether the defendant deliberately copied the ideas or design of another; (2) whether the defendant, when he knew of the other's patent protection, investigated the scope of the patent and formed a good faith belief that it was invalid or that it was not infringed; (3) the defendant's behavior as a party to the litigation; (4) the defendant's size and financial condition; (5) the closeness of the case; (6) the duration of the defendant's misconduct; (7) remedial action by the defendant; (8) the defendant's motivation for harm; and (9) whether defendant attempted to conceal its infringement.

Saint Gobain's request for attorney's fees is governed by 35 U.S.C. § 285, which provides for attorney's fees for "exceptional" patent cases. The statute does not define the term "exceptional," but "the Committee on the Judiciary stated that the remedy of attorneys' fees 'should be available in exceptional cases, i.e., in infringement cases where the acts of infringement can be characterized as 'malicious' 'fraudulent,' 'deliberate,' or 'willful.'" *Playboy Enter., Inc. v. Baccarat Clothing Co., Inc.*, 692 F.2d 1272, 1276 (9th Cir. 1982).

Finally, prejudgment interest is available, upon a proper showing, under 35 U.S.C. § 284. The purpose of such an award is to fully compensate patent holders for infringement. *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 654 (1983).

## I.     Xinyi's Motion for Oral Argument

Before the Court can reach the merits of Saint Gobain's damages motion, it must address Xinyi's request for oral argument. Xinyi believes that oral argument "will aid this court in understanding the complex issues raised in both parties' briefs, including

the Federal Circuit's recent en banc decision in *In re Seagate*, which substantially changed the law of willfulness and enhanced damages." (Doc. No. 230, Mot. at 2.)

As will be illustrated more fully below, Saint Gobain looks to the trial testimony of Xinyi's officials and the litigation conduct of Xinyi's attorneys to support its request for enhanced damages. Xinyi relies primarily upon what it believes was the closeness of claim construction and the question of infringement to oppose enhancement. The undersigned presided over both claim construction and the trial in this matter, and is, therefore, extremely familiar with the well developed record as to these events. Moreover, the decisions interpreting and applying *Seagate* and other applicable decisions are readily available to the Court, and the Court also has the benefit of the thorough briefing by the parties on all pertinent issues. The Court finds that oral argument is not necessary, and **DENIES** Xiny's motion. Having denied Xinyi's motion on the merits, the Court **DENIES** as moot Saint Gobain's motion to strike Xinyi's motion.

I.        **The Jury's Finding of Willfulness**

Assessing enhanced damages is a two-step process: first, the fact finder must determine if an accused infringer is guilty of conduct, such as willfulness, upon which enhanced damages may be based, and, if so, the court must then exercise its discretion to determine if damages should be enhanced given the totality of the circumstances. *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1380 (Fed. Cir. 2001). *See Read*, 970 F.2d at 826. Under the *Seagate* standard, the first prong requires clear and convincing evidence of objective recklessness. *In re Seagate Tech.*, 497 F.3d at 1371. The second prong requires a showing that the objectively-defined risk was known or should have been known to the accused infringer. *Id*. Courts are guided in

6

the second step by the previously mentioned *Read* factors. *i4i L.P. v. Microsoft Corp*., 589 F.3d 1246, 1274 (Fed. Cir. 2009).

A finding of willfulness does not mandate the enhancement of damages, *Read*, 970 F.2d at 826; *Informatica Corp. v. Business Objects Data Integration*, 527 F. Supp. 2d 1076, 1082 (N.D. Cal. 2007). *See In re Seagate Tech., LLC*, 497 F.3d at 1368 ("[A] finding of willfulness does not require an award of enhanced damages; it merely permits it.") "Rather, 'the paramount determination [for enhanced damages] is the egregiousness of the defendant's conduct based on all the facts and circumstances.'" *Electro Sci. Indus. v. Gen. Scanning, Inc.,* 247 F.3d 1341, 1353 (Fed. Cir. 2001) (quoting *Read*, 970 F.2d at 826). *See Jurgens v. McKasy*, 927 F.2d 1552, 1562 (Fed Cir.), cert. denied, 112 S. Ct. 281 (1991). Where the jury finds willfulness, the court should provide reasons for not enhancing the damage award. *Tate Access Floors, Inc. Maxcess Tech.*, 222 F.3d 958, 972 (Fed. Cir. 2000).

Directing itself to the first prong of the willfulness test, Xinyi argues that the closeness of claims construction precludes a finding of willfulness. Xinyi explains:

> Here, there was a close question regarding the proper construction of "centering," and, under Xinyi's proposed construction, there likely would not have been a finding of infringement. Although the Court ultimately rejected Xinyi's proposed construction, that construction was nevertheless objectively reasonable because it was supported by the intrinsic record and Federal Circuit precedent. The jury, on the other hand, was unaware of the closeness of this claim-construction issue because the matter was resolved before trial. Thus, the jury did not have all of the necessary evidence to determine whether there was, in fact, an objectively high likelihood of infringement in this case.

(Doc. No. 229, Opp. at 1.) Xinyi maintains that because the jury was unaware of the "struggle over claim construction," the jury did not have all the evidence necessary to

properly assess whether Xinyi willfully infringed. (*Id*. at 3.) For this reason, Xinyi requests that the Court set aside the jury's finding of willfulness.

Saint Gobain offers two reasons why the Court may not revisit the jury's willfulness verdict. First, it argues that Xinyi offers no legal basis for setting aside a jury's willfulness finding. Second, Saint Gobain insists that Xinyi waived the issue by failing to file a JMOL on this issue at trial. As to the latter, the Court agrees and finds no basis in the Federal Rules of Civil Procedure for a motion to set aside a verdict in the absence of a motion for a JMOL made prior to the submission of the case to the jury. *See American & Foreign Ins. Co. v. Bolt*, 106 F.3d 155, 160 (6th Cir. 1997) (citing additional supporting authority) (a court may not grant judgment notwithstanding the verdict (JNOV) where the decision would be based on grounds other than those advanced in the party's JMOL motion).

As to the former argument, the Court is mindful of the deference that it must accord any decision reached by the jury. Nonetheless, Saint Gobain has not offered any evidence that would call into question the ability of the trial court to entertain a properly filed JNOV after the jury's verdict in favor of the patentee on the issue of willfulness. *See, e.g., Hako-Med USA, Inc. v. Axiom Worldwide, Inc*., 2009 U.S. Dist. LEXIS 92712, at \*16 (M.D. Fla. Sept. 22, 2009) (district court set aside a jury's threshold finding of willfulness). The right to such a remedy makes sense because where claim construction is hotly disputed, and the accused infringer could have reasonably relied on his construction of the claims as not infringing, there can be no objectively high

likelihood that the accused infringer's actions constituted infringement.[3] *See, e.g.,*
*Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1374 (Fed. Cir. 2008) ("Because
[the term] "rigid" was susceptible to a reasonable construction under which [the alleged
infringer's] products did not infringe, there was not an objectively high likelihood that
[its] actions constituted infringement.")[4]

        Thus, had Xinyi raised this issue in a timely fashion, the first question for
this Court would have been: was the ruling on claim construction a "close call?" The
Court would have answered this question in the negative.

        At claim construction, while Saint Gobain maintained that the term
"centering" required no construction, Xinyi urged that the term be construed to mean that
the glazing is centered so that "a gap of even width remains all around the glazing." As
for the term "force for centering," Xinyi proposed the following construction: "pressure
sufficient to overcome friction and move the weight of the window to provide a constant
gap of even width all around the glazing." Because the spacer on Xinyi's glazing
products was not capable of creating this even gap all along the glazing, Xinyi insisted
that its products did not infringe.

---

[3] Courts have also refused to find willfulness where defenses to infringement represented "close calls*." See
Ricoh Co. v. Quanta Computer Inc.*, 2009 U.S. Dist. LEXIS 107759, at *3 (W.D. Wis. Nov. 18, 2009)
("There can be no 'objectively high likelihood' where a question of infringement or invalidity involves
reasonable differences of opinion or close questions [...]."); *OPTi Inc. v. Apple, Inc.*, 2009 WL 4727912, at
*2 (E.D. Tex. Dec. 3, 2009) ("[S]trong, but unsuccessful noninfringement and invalidity defenses presented
during litigation weigh against a finding of objective recklessness.") *See, e.g., DePuy Spine, Inc. v.
Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1337 (Fed. Cir. 2009) (district court properly granted
accused infringer's JMOL on the issue of willfulness where the jury could have reasonably found for either
party on the question of equivalence).

[4] Saint Gobain complains that the decision in *Cohesive Technologies* is inapposite because it was rendered
during a bench, and not a jury, trial. Such a distinction actually highlights the need for such relief. While
the district court in *Cohesive Technologies* was aware of the closeness of claim construction, a jury faced
with the task of ruling on willfulness would not have access to this information.

In support of its proposed construction of "centering," Xinyi relied upon specification language that provides that "[d]uring insertion of the glazing into the window frame, glazing is automatically centered, so that a gap of even width remains all around the glazing." Xinyi also cited prosecution history in an attempt to demonstrate that the glazing must be centered uniformly along all four sides of the glazing, irrespective of whether all four sides have a spacer.

The Court rejected this evidence, noting that both the specification language and the prosecution history came from U.S. Patent No. 5,519,979 (the "979" patent), a predecessor to the '395 patent. The Court explained that the '979 patent required a spacer to be present on all four sides of the glazing, while the relevant claim of the '395 patent only provided for a glazing that "has a spacer on at least a portion of its periphery." This distinction was important because the claim language indicated that the function of centering could only occur along the portion of the periphery of the glazing to which the spacer was attached. The Court concluded that Xinyi's proposed construction was contrary to the plain language of the relevant claim, would improperly import a limitation not intended by the inventor, and would be based upon a limitation found in the specification of the original, and not the reissued, patent.

Having defined the term "centering," the Court determined that Xinyi's proposed construction of "force for centering"—which presupposed the adoption of its definition of "centering"—also failed. The Court found that the force for centering was "provided by the spacer, and 'sufficient to maintain centering of the glazing on the

bracket and to provide a gap between' the edge of the glazing and the bracket, along the portion of the periphery where there is a spacer.'"[5]

While Xinyi is still advocating the same construction it proposed at the claim construction stage, it offers new evidence in support of its position. With respect to the term "centering," Xinyi points to a dictionary definition that defines "center" as "1) a point of place that is *equally distant from the sides or outer boundaries of something*; 2a) a point *equidistant* from the vertexes of a regular polygon; 2b) a point *equidistant from all points on the circumference of a circle* or on the surface of a sphere." (Mem. Opp. at 5, citing American Heritage Dictionary 277 (3d ed.)) (emphasis supplied by Xinyi). Xinyi also directs the Court to the '669 specification language that states that: "[d]uring insertion of the glazing into the window frame, glazing 1 is automatically centered, so that a gap 12 of even width remains all around glazing." ('669 patent, col. 3, l. 19-22.) As for the term "force for centering," found in the '395 patent, Xinyi now claims that its previously proposed construction was objectively reasonable under the recapture rule.

Of course, Xinyi may not rely upon new arguments post-verdict to show that claim construction *was* a close call. *Cf. Creative Internet Adver. Corp. v. Yahoo! Inc.*, 2009 U.S. Dist. LEXIS 65690, at *16 (E.D. Tex. July 30, 2009) (alleged infringer's claim construction, not raised until after judgment, "is no justification for the Court to now grant judgment as a matter of law on the issue of willful infringement.") Even if these arguments had been presented at claim construction, however, they would not have brought Xinyi any closer to its desired language. The new dictionary definition represents

---

[5] As was the case in the '395 patent, the Court found that the term "centering," appearing in Claim 1 of the '669 patent, also required no construction.

11

extrinsic evidence that cannot be used to contradict the meaning of claims discernable from examination of the claims, the written description, and the prosecution history. *See Pitney Bowes, Inc. v. Hewlett-Packard Co*., 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Further, as the Court found at claim construction, the '669 specification language relied upon by Xinyi "lacks the clear expression of intent needed to perform a lexicographic function and, moreover, is not phrased in express definitional language."[6] (Claim Const. Mem. at 16.) As was the case at claim construction, Xinyi is unable to point to any evidence that the centering function described in either the '395 or the '669 patent was to be performed on all sides of the glazing, irrespective of the placement of the lip.

The doctrine of recapture also fails to recast Xinyi's rejected construction of "force for centering" in more favorable light. "The recapture rule is a limitation on the ability of patentees to broaden their patents after issuance." *MBO Labs., Inc. v. Becton, Dickinson & Co*., 474 F.3d 1323, 1331 (Fed. Cir. 2007). Under 35 U.S.C. § 251, the patentee may seek a reissue patent to broaden his patent after issuance. While § 251 is to be interpreted liberally, "[m]aterial which has been surrendered in order to obtain issuance [of the original patent] may not be reclaimed via section 251 […]." *Id*. By preventing a patentee from expanding his patent on reissue to recover surrendered embodiments, the recapture rule protects the public's ability to rely on a patent's public record. *Vectra Fitness, Inc. v. TNWK Corp.*, 162 F.3d 1379, 1384 (Fed. Cir. 1998).

---

[6] This definition is entitled to even less when one considers that the "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). Xinyi offers no evidence that this definition, found in a non-technical dictionary, speaks to the community of individuals who are skilled in the relevant part.

During the prosecution of the '979 patent, the language "substantially the entire periphery" was added before any substantive response from the examiner, and was not added to in order to obtain issuance of the patent. (Mot. for Enhancement, Ex. 2, Nov. 1, 1994 Supp. Prelim. Amendment.) Therefore, the omission of the language from the '395 patent did not represent an improper attempt to recover surrendered embodiments, and the recapture rule cannot be used to put Xinyi's proposed construction on any firmer ground.

Having revisited the issue of claim construction, the Court remains convinced that the issue of claim construction of the terms "centering" and "force for centering" was properly resolved, and that Xinyi's proposed construction would have represented a departure from the plain and ordinary meaning of these terms. Because the Court would have had to contravene a cardinal principle of claim construction to adopt Xinyi's construction, namely to import limitations not found in the claims, the Court cannot find that Xinyi's position was reasonable. Confronted only with Xinyi's unreasonable position, the Court cannot say that the issue of claim construction was close. Xinyi's position at claim construction, therefore, cannot be used to call into question the jury's finding of willfulness. Even if the issue was properly before it, the Court would deny Xinyi's request to set aside the jury's willfulness verdict. *Contra OPTi Inc.,* 2009 WL 4727912, at *3 (accused infringer's strong position on noninfringement and invalidity, though rejected by the district court, was sufficient to set aside the jury's finding of willfulness).

II.     The *Read* Factors

Turning to the second prong of the analysis, the Court begins with the factors set forth in *Read*. Both sides insist that the balance of these factors weighs in favor of their respective positions on the availability of enhanced damages. The Court now addresses each of the nine *Read* factors in turn, noting that several of the factors are overlapping and may involve similar considerations.

*(1)     Deliberate Copying*

At trial, the President of Xinyi, Antonio Tam, testified that it is Xinyi's goal to make a windshield that is "as similar as possible" (TR at 553) to the previous windshield in the automobile. (TR at 552-557) Toward that end, Xinyi would receive windshield samples from customers so that the factory in China could examine the sample windshield (TR at 553), and make a copy so that the customer will find that it looks just like the original windshield. (TR at 554.) According to Tam, Xinyi wanted the copied windshield to be as close in appearance to the original and *just as good in terms of function*. (TR at 555.) He further confirmed that some of the windshield samples shipped to the factory in China were from Saint Gobain (TR at 556), and from those samples copies were made with the same lips and bumps present in the Saint Gobain samples. (*Id*.:"[M]y understanding is that our people in the factory would manufacture the products close to what the sample shows to them.") Xinyi representative Shin Kan Lee also confirmed that Xinyi's business model involved making the replacement windshield as similar as possible to the sample. (TR at 678.)

Xinyi does not deny this rather compelling testimony on copying. Rather, Xinyi argues that "there was not one shred of evidence at trial that the allegedly copied

14

windshields had lips that were strong enough to perform the "centering" function. Yet, as noted above, Tam admitted that the copied Xinyi windshields had the same lips and bumps present in the Saint Gobain windshields. (TR at 556.) Further, Saint Gobain's expert, Robert Beranek, testified that the windshields of Saint Gobain and Xinyi "worked exactly the same," i.e., they both provided a force for centering. (TR at 446.)

Xinyi also argues that any copying took place long before Xinyi learned of the patents-in-suit. This is not borne out by the record. Xinyi learned of the Saint Gobain patents no later than May, 2005, when Tam received a copy of the complaint of the lawsuit filed against a competitor, Fuyao, on the same Saint Gobain patents. (TR at 622-625.)  Xinyi received sample Saint Gobain windshields in 2006 and 2007, and did not even begin to make certain infringing models until after the lawsuit was filed. (*See* Doc. No. 231, Reply, Exs. 5 and 6.) For this same reason, Xinyi's argument that its copying is excused because Saint Gobain's windshields were not marked also fails.

The evidence at trial clearly supports a finding that Xinyi deliberately copied Saint Gobain's windshields.[7] The first factor, therefore, weighs in favor of enhancement.

(2) *Investigation of the Scope of the Patent/Good Faith Belief Regarding Defenses*

The record shows that Tam received a copy of the Fuyao complaint, in English, in May, 2005, and, concerned that the Xinyi might be infringing the same Saint

---

[7] In so ruling, the Court notes that it is not employing the pre-*Seagate* standard, which would have, after learning of the existence of the Saint Gobain patents, imposed upon Xinyi the affirmative duty to ensure that its products did not infringe by, for example, acquiring the opinion of counsel. *See Underwriter Devices, Inc*., 717 F.3d at 1389-1390.

Gobain patents identified in the Fuyao complaint, alerted representatives of Xinyi in China. (TR at 623.) Upon transmission of the complaint, Tam essentially washed his hands of the matter. (*Id*.: "I have already done my part.") After receiving the complaint from Tam, Xinyi representative, Charles Zha, forwarded on the copy to Wang Kang. Kang advised Zha that he could not read English. Notwithstanding this obvious obstacle, Zha did not give Kang a version of the complaint in Chinese. Accordingly, Kang admits that he only looked at the drawings appended to the complaint. (TR at 688-89.) He further admits that he did not get a Chinese version of the Saint Gobain patents until late 2006, and decided that there was no possible infringement because Xinyi installed the molding on the windshields in a different manner. (TR at 689-90.) Further, Shin Kang Lee, Vice General Manager of Xinyi, testified that Xinyi did not have a factual basis for believing that it did not infringe upon the Saint Gobain windshields in February 2007. (TR at 679.)

Xinyi argues, however, that upon learning of the Saint Gobain patents, it initiated an investigation and, at its conclusion, determined that "our products shouldn't have any problems" because "our molding are not made to perform any specific functions." (TR at 673, testimony of Wang Kang.) Xinyi argues that "[h]aving thus made this investigation, and knowing that its moldings were not made to perform the 'centering' function touted in the patents-in-suit, Xinyi had a reasonable basis for believing that it did not infringe those patents." (Mem. in Opp. at 15.)

The Court finds that Xinyi's superficial investigation could not have lead to a good faith belief regarding its defenses to a claim of infringement by Saint Gobain. Xinyi waited almost a year to obtain a version of the Fuyao complaint that its

16

representative could read. It is also undisputed that Xinyi did not obtain an opinion of counsel on the subject of infringement. While (in the wake of *Seagate*), there is no longer an affirmative duty to obtain an opinion of counsel, "whether a defendant secured an invalidity opinion is part of the Court's consideration of the 'totality of the circumstances.'" *Hako*, 2009 U.S. Dist. LEXIS 92712, at *26. The cavalier manner in which Xinyi treated its potential liability for infringing upon the Saint Gobain patents clearly weighs in favor of a finding of enhancement.

Xinyi also argues, however, that it engaged in a good faith effort to "design around" the Saint Gobain patents, and that this fact should support a finding that Xinyi made a good faith attempt to avoid infringement. In late 2007 or early 2008, Xinyi changed its molding material from plasticized PVC to thermoplastic vulcanizate, which is softer. (TR at 1026, 1076, 1208-1209.) Because the prosecution history of the '395 patent stressed that the claimed invention required a harder material for the lip than the prior art in order to perform the centering function, Xinyi believed that switching to a softer material would be sufficient to avoid infringement of the Saint Gobain patents. (Mem. in Opp. at 15-16.) However, when Xinyi realized that the low durometer PVC did not meet its requirements, Xinyi changed to a TPV material. (TR at 687, 1076.)

Designing or inventing around patents to make new inventions is encouraged. *London v. Carson Pirie Scott & Co*., 946 F.2d 1534, 1538 (Fed. Cir. 1991). The Federal Circuit has explained that:

> [K]eeping track of a competitor's products and designing new and possibly better or cheaper functional equivalents is the stuff of which competition is made and is supposed to benefit the consumer. One of the benefits of a patent system is its so-called "negative incentive" to "design around" a competitor's products, even when they are patented, thus

17

> bringing a steady flow of innovations to the marketplace. It should be not
> be discouraged by punitive damage awards except in cases where conduct
> is so obnoxious as clearly to call for them. The world of competition is full
> of "fair fights" […].

*State Indus., Inc. v. A.O. Smith Corp*., 751 F.2d 1226, 1235-36 (Fed. Cir. 1985).  Further,

it is well settled that an accused infringer does not act willfully merely because its

attempts to avoid infringement by redesigning around the patents prove unsuccessful.

*Alloc, Inc. v. Norman D. Lifton Co.,* 653 F. Supp. 2d 469, 476 (S.D.N.Y. 2009). *See*

*Westvaco v. International Paper Co.*, 991 F.2d 735, 745 (Fed. Cir. 1993).

The Court finds, however, that Xinyi's efforts to redesign do not support a

finding that it had a good faith belief that it was not infringing, and that its reliance on

such evidence now is disingenuous. Several Xinyi witnesses testified that the lip of the

Xinyi windshields performed no particular function (TR at 673-74), and that it was there

solely for cosmetic reasons (TR at 1017, 1051-52) and to seal the window. (TR at 1072.)

Yet, if this was truly the case, and Xinyi needed its lip to perform no particular function,

then it would not have mattered what kind of material it used, and the redesign using the

softer material would have worked. Even if there was some evidence that Xinyi had a

good faith belief that its windshields did not infringe prior to the redesign, any such belief

would have been dashed when it learned during the redesign that it could not get by with

the softer PVC material. Of course, the fact that the engineers tested the material during

the redesign supports the conclusion that Xinyi never believed that its lips did not

perform any particular function. (TR at 1076.)

Having reviewed the trial testimony relating to Xinyi's redesign efforts,

the Court finds that it does not support a finding that Xinyi had a good faith believe that

its windshields did not infringe. Balanced against this weak offering of proof is the previously mentioned evidence demonstrating that Xinyi dragged its heels in investigating its potential liability under the patents and, in fact, did not even attempt to redesign its products until almost a year after the present lawsuit was filed. This factor clearly weighs in favor of enhancement.

### (3)    Litigation Conduct

The third *Read* factor requires the Court to consider "the infringer's behavior as a party to the litigation." *Read*, 970 F.2d at 827. Saint Gobain argues that Xinyi engaged in litigation misconduct by "continually changing its theories and presenting assertions that were both legally and factually unsupported, requiring Saint-Gobain and the Court to waste significant time and resources." (Mot. at 7.) In particular, Saint Gobain highlights the following: Xinyi presented an obviousness defense for the first time at summary judgment, dropped its invalidity defense on the eve of trial, made several representations during opening statements and closing arguments that were not supported by the facts, and presented a baseless defense of non-enablement, which was dismissed via a JMOL, and non-infringement. (Mot. at 7-11.)

Xinyi denies that it engaged in litigation misconduct, and insists that there was only "vigorous, hard fought advocacy by both sides […]." (Mem. in Opp. at 16, quoting *Advanced Cardiovascular Sys., Inc. v. Medtronics, Inc*., 2000 U.S. Dist. LEXIS 22648, at *38 (N.D. Cal. Mar. 31, 2000) (refusing to find litigation misconduct)).  Xinyi believes that the record shows that its counsel presented its case professionally and responsibly.

19

The Court finds that the record is replete with instances where Defendants pursued a course of conduct that had the effect of unduly burdening the Court with unnecessary matters and prolonging the litigation. As previously mentioned, Xinyi raised the defense of obviousness at summary judgment after failing to respond to repeated discovery requests regarding this particular defense. The Court was forced to strike the defense upon Saint Gobain's motion. (MSJ Memo. Op. at 6.) Xinyi also attempted to raise a non-enablement defense, which it had not even plead, for the first time at summary judgment. While the Court permitted the defense to proceed to trial, it did so only because Saint Gobain had procured its own expert on the subject of non-enablement and was, therefore, not prejudiced by Xinyi's glaring omission.[8] (*Id.* at 10-13.) The non-enablement claim was eventually dismissed upon Saint Gobain's motion for JMOL because Xinyi offered no evidence in support of this defense, and its expert was not even qualified to offer an opinion on the subject. Xinyi also dropped its invalidity defense of anticipation and its defense of indefiniteness immediately prior to trial.[9]

This vexatious conduct continued into the trial, itself. During opening statements, Xinyi raised the issue of laches. Throughout the trial, Xinyi repeatedly asked the Court to permit briefing on the issue, and then dropped the defense without

---

[8] In fact, the Court finds that Defendants' summary judgment motion was, at best, ill-advised, and at worst, frivolous. The Court denied Xinyi's motions, *in toto*, denying Xinyi any of the relief it requested, and further striking one of its defenses. While the mere fact that the Court denied Xinyi's dispositive motion is not evidence of misconduct, *see Advanced Cardiovascular Sys., Inc.*, 2000 U.S. Dist. LEXIS 22648, at *38; *Hako-Med USA, Inc.*, 2009 U.S. Dist. LEXIS 92712, at *27, the request for summary judgment when the parties' dueling experts precluded a finding that there were no genuine issues of material fact as to non-infringement and non-enablement forced the Court to expend effort to resolve a baseless motion that clearly could not have been granted.

[9] The Court acknowledges that the mere fact that a litigant abandons a claim or defense is not, in and of itself, evidence of vexatious activity. *See Beckman v. Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed. Cir. 1989). However, a pattern of raising and discarding claims or defenses may constitute a *strategy* of vexatious activity. *Id.*

explanation. Despite this action, Xinyi kept making reference to the defense, and the Court was forced to prohibit Xinyi from making any further mention of these arguments.[10]

Counsel for Xinyi also objected to several previously agreed to jury instruction and also introduced several new jury instructions after the Court had conducted its conference on the instructions. (TR at 1553-54.)

In addition, Xinyi "pursued a strategy of giving superficial recognition to the Court's claim construction rulings, while continuing to press its own interpretation of the claims." *Kellog v. Nike, Inc*., 2009 U.S. Dist. LEXIS 90432, at *37 (D. Neb. Sept. 30, 2009). While Xinyi claimed to accept that the Court had previously determined that the term "centering" did not require construction, it argued that this determination necessarily required the jury to determine what the ordinary and customary meaning of "centering" is. It expressed its intent to offer its previously rejected definition as the "ordinary and customary meaning," thereby re-injecting the issue of claim construction via the back door. The Court was required to grant Saint Gobain's motion in limine to prevent Xinyi from revisiting claim construction at trial. (*See* Doc. No. 200 at 19-20.) Such a failure to afford deference to a trial court's rulings constituted further evidence of litigation misconduct. *See, e.g., Id.*. at *37 (disregarding the district court's rulings at claim construction amounted to litigation misconduct.)

There can be no question that Xinyi utilized a trial strategy of advancing and then withdrawing untenable defenses, and ignoring the Court's prior rulings and

---

[10] Counsel for Xinyi also objected to several previously agreed to jury instruction and also introduced several new jury instructions after the court had conducted its conference on instructions. (TR at 1553-54.)

determinations. This approach to litigation had the effect of unnecessarily clouding the true issues at trial and prolonging the litigation. Consequently, the third *Read* factor weighs in favor of enhancement.

### (4) Defendants' Size/Financial Condition

In support of the fourth *Read* factor, Saint Gobain offers the declaration of its counsel, Barry Herman, wherein Attorney Herman represented that Xinyi Glass Holdings had gross revenues of over 500 million dollars in 2008. (*See* Mot., Ex. 2, Declaration of Barry Herman at ¶ 3, citing Ex. A.) Saint Gobain also relies on trial testimony from Xinyi officials that Xinyi sold 3000 windshield models in the United States, and that this was a minor part of its business. (Tr at 667, 1107, 1118.)

The focus of the fourth factor is the overall financial health of the accused infringer. *See Hako*, 2009 U.S. Dist. LEXIS 92712, at *28. As Xinyi points out, Saint Gobain's hearsay evidence of Xinyi Glass Holdings' revenues has no relevance because Xinyi Glass Holdings is not a party to this lawsuit. Likewise, the fact that Xinyi has thousands of models available for sale in the United States sheds no light on the ultimate sales and revenue from these models, and brings the Court no closer to judging the overall financial health of Defendants.

In contrast to Saint Gobain's evidence on financial condition, Xinyi relies on declarations from two of its executives, Charles Zha and Antonio Tam. Zha avers that Xinyi has experienced a decline in sales of windshields due to the sluggish economy, noting that sales of Xinyi windshields are down approximately 30% in 2009. (Mem. in Opp., Ex. 8, Zha Declaration at ¶¶ 4-5.) Tam avers that Xinyi North America had only 2,000,000 in revenue in 2009, and believes that any enhanced damages award would be

22

"severely debilitating to Xinyi North America." (Mem. in Opp., Ex. 9, Tam Declaration at ¶¶ 4, 6.)

Saint Gobain maintains that Xinyi's "self-serving, yet inconsistent, declarations submitted with its opposition do not provide support than an enhanced damages award would substantially harm it." (Reply at 8.) Saint Gobain forgets, however, that it bears the burden of proof. *See Hako-Med USA, Inc.*, 2009 U.S. Dist. LEXIS 92712, at *32. The Court agrees with Xinyi that Saint Gobain's vague and sketchy evidence fails to establish that Xinyi's size favors enhancement.

(5) *Closeness of the Case*

Saint Gobain argues that this was not a close case. It notes that Xinyi did not put forth a meritorious challenge to validity, that it dropped its anticipation and indefiniteness assertions before trial, and that the Court dismissed Xinyi's obviousness defense prior to trial. Saint Gobain also underscores the fact that Xinyi's enablement defense was so weak that the Court granted Saint Gobain's motion for JMOL because Xinyi's expert had no experience in the relevant area, was not qualified to offer an opinion on enablement, and was unable to give any guidance to the jury. (TR at 1885-86.) Xinyi, once again, insists that claim construction was a close call, and that if its construction of "centering" and "force for centering" had been adopted, "there likely would have been no finding of infringement at all, let alone willful infringement." (Mem. in Opp. at 17.)

As the Court has previously determined, claim construction was not a close call. In order to adopt Xinyi's proposed claim construction, the Court would have had to disregard the plain and ordinary meaning of the claim language and import

limitations not intended by the inventor. Further, while "strong, but unsuccessful noninfringement and invalidity defenses presented during litigation weigh against a finding of objective recklessness," *OPTi Inc.*, 2009 WL 4727912, at *2-3, Xinyi's defenses were weak, at best. This factor weighs in favor of enhancement.

(6)    *Duration of Defendants' Misconduct*

Saint Gobain argues that the record demonstrates that Xinyi infringed the patent-in-suit for almost seven years, beginning in 2002, and for almost three years after Saint Gobain filed its complaint. Xinyi responds by noting that it did not even have notice of the patents until 2005 because Saint Gobain chose not to mark its own products. Further, it insists that once received notice, it changed its design.

The Court agrees with Xinyi that Saint Gobain has failed to establish that Xinyi had any knowledge of the Saint Gobain patents until Xinyi received a copy of the Fuyao complaint in May, 2005. Nonetheless, even if the Court credits Xinyi with the time after it redesigned its products, the record shows that Xinyi continued to infringe for more than two years after learning of Saint Gobain's patents.[11] The Court finds that this factor favors enhancement. *See, e.g., Broadcom Corp v. Qualcomm Inc.*, 2007 WL 2326838, at *3 (C.D. Cal. Aug. 10, 2007) ("The length of [defendant's] infringement (approximately two years), coupled with the fact that infringement continued after [plaintiff' filed its suit, supports an increase in damages.")

---

[11] Indeed, there was evidence that Xinyi continued to infringe well after the lawsuit was filed because the jury found that XInyi's redesigned products also infringed upon Saint Gobain's patents.

24

(7)      *Remedial Action taken by Defendants*

The seventh *Read* factor requires the Court to determine whether Xinyi took any remedial action once it became aware of Saint Gobain's patents. *Read*, 970 F.2d at 827. Xinyi points to its redesign efforts, arguing that once it learned of the patents, it made a good faith attempt to avoid infringement. In contrast, Saint Gobain insists that Xinyi took no remedial action, and that Xinyi's redesign efforts only reinforce this conclusion because the new design used material that was even stronger than the original lip material. (Mot. at 14.)

As previously discussed, the evidence surrounding the attempted redesign does not support a finding that Xinyi made a good faith effort to redesign its product to avoid infringement. The weight of this evidence is further reduced by the fact that Xinyi officials took over a year to convert the Fuyao complaint into a readable format, and waited until after the present lawsuit was filed to even attempt to redesign its lip. The fact that Xinyi sold infringing products for several years after it became aware of Saint Gobain's patents, demonstrates that Xinyi recklessly ignored an obvious risk. *See, e.g., Krippelz v. Ford Motor Co.*, 2009 U.S. Dist. LEXIS 110197, at *13-*14 (N.D. Ill. Nov. 18, 2009). Weighing Xinyi's questionable design attempt against its otherwise nonexistent effort to remedy the situation, the Court finds that this factor favors enhancement.

(8)      *Defendants' Motivation for Harm*

In making a determination about this factor, the Court looks to Xinyi's marketplace conduct. *See Joyal Prods. v. Johnson Elec. North Am., Inc.*, 2009 U.S. Dist. LEXIS 15531, at *23 (D.N.J. Feb. 27, 2009). Saint Gobain alleges that Xinyi "tried to

25

eliminate [it] as a competitor by copying its windshields to drive it out of the market." (Mot. at 14.) Indeed, evidence at trial revealed that Xinyi sold its copied windshields at prices considerably lower than Saint Gobain's windshields, causing Saint Gobain to have to lower its prices to remain competitive. (TR at 771-72, 795-96.)

Xinyi challenges this evidence, noting that the trial testimony established that Xinyi did not knowingly set its prices in an effort to drive Saint Gobtain out of the market. Xinyi witnesses claimed that they did not know that Xinyi was selling windshields at a lower price than Saint Gobain. (TR at 572, 574, and 666-67.)

The Court does not find Xinyi's alleged ignorance of Saint Gobain's pricing persuasive. Xinyi employees admitted that they were offering a lower price to attract customers (TR at 572), and admitted that their prices could have been discounted as much as 50% of what Saint Gobain was offering. (TR at 574.)

While the Court questions whether an admittedly smaller company like Xinyi could have driven a much larger company like Saint Gobain out of the market entirely, it finds that Xinyi's efforts had the likely effect of harming Saint Gobain. This factor favors enhancement.

(9)     *Defendants' Attempt to Conceal Infringement*

Xinyi argues that there is absolutely no evidence that Saint Gobain attempted to conceal its infringement. Saint Gobain points only to a dispute during discovery wherein Saint Gobain alleges that Xinyi attempted to cover up its failed attempts to design around the Saint Gobain windshields by initially refusing to produce documents relating to the redesign. The Court is unwilling to impute a motive to conceal or hide from a discovery dispute. *Cf Liquid Dynamics Corp. v. Vaughan Co.*, 2005 U.S.

26

Dist. LEXIS 6162, at *8 (N.D. Ill. Mar. 22, 2005) (insufficiency of discovery production did not factor into the enhancement analysis). Further, there was no evidence that Xinyi, upon learning of the Saint Gobain patents, took any measures to conceal or hide its activities. The Court finds that this final factor weighs against enhancement.

*Read Factors Analysis and Conclusion*

The Court finds that, on balance, the totality of the circumstances merits an increase in the damages award. Though the factors are split between those that favor an increase and those that do not (with the majority of the factors weighing in favor enhancement), the "paramount determination in deciding to grant enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all the facts and circumstances." *Read*, 970 F.2d at 826. The deliberate nature of Xinyi's copying actions, with the obvious intent to undermine Saint Gobain's position in the marketplace, coupled with Xinyi's inadequate investigation, lead to the conclusion that enhancement is warranted under § 284. Here, as in *Hoechst Celanese Corp. v. BP Chems.*, 846 F. Supp. 542, 549 (S.D. Tex. 1994), however, doubling damages adequately deters infringement and ensures that Defendants will not profit from the infringement, while "acknowledging that this case does not present the extreme circumstances of the most egregious types of

27

patent piracy which would warrant treble damages."[12] *See, e.g., Chisum v. Brewco Sales & Mfg.*, 726 F. Supp. 1499, 1514 (W.D. Ky. 1989) (Doubling damages rather than trebling because infringer's conduct was not so egregious as to warrant the highest level of damages); *Krippelz*, 2009 U.S. Dist. LEXIS 107577, at *25 (doubling damages was appropriate where only five of the nine *Read* factors favored enhancement).

### III.     Attorney's Fees

#### *The Exceptional Case*

"The court in exceptional [patent] cases may award reasonable attorney's fees to the prevailing party." 35 U.S.C § 285. An award of attorney's fees under § 285 requires a two step analysis: (1) the party moving the court to award fees must prove by clear and convincing evidence that the case is exceptional; and (2) the court must determine whether such an award is warranted. *Digeo, Inc. v. Audible, Inc*., 505 F.3d 1362, 1366-67 (Fed. Cir. 2007); *Wedgetail, Ltd. v. Huddleston Deluxe, Inc*., 576 F.3d 1302, 1304 (Fed. Cir. 2009).

---

[12] Xinyi also argues that the jury award cannot be enhanced because the calculation upon which it rests is fatally flawed. Specifically, Xinyi argues that the damage award is inaccurate because it focuses upon the number of accused windshields *sold* rather than the number of windshields *installed* in vehicles. Because the patents address a procedure for installation, and there can be no infringement of the patents until the installation is performed, Xinyi insists that the failure to draw this distinction leaves the jury's verdict on shaky ground. According to Xinyi, to enhance the inaccurate award would only compound the calculation error. (Mem. in Opp. at 18-19.) The Court is not persuaded. This issue was never raised by Xinyi during the trial or at its conclusion. Nor was there any evidence to suggest that any windshields were purchased but never installed. Moreover, the question of whether the underlying damage award has been calculated accurately has no bearing on the question of whether enhanced damages should be awarded. Of course, it is disingenuous for Xinyi to raise this argument post-trial in light of the testimony of its employees who stated that they understood that the windshields purchased from Xinyi would be installed in vehicles. (TR at 550-51, 561.) Indeed, Antonio Tam testified that "[i]t's a fact" that windshields manufactured by Xinyi are ultimately placed in automobiles. (TR at 551.)

"A case may be deemed exceptional when there has been some material inappropriate conduct related to the matter in litigation, such as willful infringement, fraud or inequitable conduct in procuring the patent, misconduct during litigation, vexatious or unjustified litigation, conduct that violates Fed. R. Civ. P. 11, or like infractions." *Brooks Furniture Mfg. v. Dutailier Int'l, Inc*., 393 F.3d 1378, 1381 (Fed. Cir. 2005) (citing *Cambridge Prods,. Ltd. v. Penn Nutrients, Inc*., 962 F.2d 1048, 1050-51 (Fed. Cir. 1992)). *See Epcon Gas Sys. Inc. v. Bauer Compressors, Inc*., 279 F.3d 1022, 1034 (Fed. Cir. 2002) (exceptional cases include: "inequitable conduct before the PTO; litigation misconduct; vexatious, unjustified, and otherwise bad faith litigation; a frivolous suit or willful infringement.") "[T]he exceptional nature of the case must be established by clear and convincing evidence," *Cambridge Prods., Ltd*., 962 F.2d at 1050, and must be determined from a consideration of the totality of the circumstances. *Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc*., 231 F.3d 1339, 1347 (Fed. Cir. 2000).

A finding of willfulness is a sufficient basis for an award of attorney's fees under § 285. *Modine Mfg. Co. v. Allen Group, Inc*., 917 F.2d 538, 543 (Fed. Cir. 1990); *Church & Dwight Co. v. Abbott Labs*., 2009 U.S. Dist. LEXIS 64459, at *10 (D.N.J. July 23, 2009). Further, "[w]hile a finding of willful infringement does not mandate that [...] attorney's fees be awarded, after an express finding of willful infringement, a trial court should provide reasons for not [...] finding a case exceptional for the purpose of awarding attorney's fees." *Tate Access Floors, Inc. v. Maxcess Techs*., 222 F.3d 958, 972 (Fed. Cir. 2000) (internal citations omitted); *Wedgetail, Ltd*., 576 F.3d at 1305. In addition, litigation misconduct may support an award of attorney's fees. *Beckman*

29

*Instruments,* 892 F.2d at 1552; *Brasseler, U.S.A. I,. L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1380 (Fed. Cir. 2001) ("Litigation misconduct and unprofessional behavior are relevant to the award of attorney fees and may suffice, by themselves, to make a case exceptional.")

   In the instant case, the Court has determined that both the jury's finding of willfulness and Defendants' litigation misconduct support a finding that the case is exceptional. *See Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951, 956 (N.D. Cal. 2009) (noting that, in determining whether a case is exceptional, a court may consider factors such as whether "the infringer engaged in litigation misconduct, advanced frivolous arguments, or willfully infringed the patent.") For the reasons previously stated in favor of enhancement, the Court finds that Saint Gobain is entitled to recover its attorney's fees under 35 U.S.C. § 285. *See, e.g., Beckman Instruments*, 892 F.2d at 1551 (strategy of vexatious activity was sufficient to support a finding of exceptional); *Amsted Indus. v. Buckeye Steel Castings Co.,* 24 F.3d 178, 184 (Fed Cir. 1994) (designation of case as exceptional supported by jury's finding of willful infringement); *Kellogg v. Nike, Inc*., 2009 U.S. Dist. LEXIS 90432, at *35 (D. Neb. Sept. 30, 2009) (accused infringer's conduct in pursuing frivolous claims was "intended to delay the proceedings, obfuscate the issues and increase […] litigation costs," and justified award of attorney's fees under § 285); *I-Flow Corp. v. Apex Med. Techs., Inc*., 2010 U.S. Dist. LEXIS 1021 (S.D. Cal. Jan. 6, 2010) (finding of willfulness sufficient for a determination of exceptional);

*A Reasonable Fee*

Having determined that this case warrants an award of attorney's fees, the Court turns its attention to the question of what fee award is reasonable. *See B-K Lighting, Inc. v. Vision3 Lighting*, 2009 U.S. Dist. LEXIS 111968, at *12 (C.D. Cal. Nov. 16, 2009) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). "[T]he most critical factor" in determining the amount of a fee award "is the degree of success obtained." *Hensley*, 461 U.S. at 436. "Where [...] a prevailing party 'has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation [...].'" *Mathis v. Spears*, 857 F.2d 749, 755 (Fed. Cir. 1988) (quoting *Hensley*, 461 U.S. at 435).

There is little doubt that counsel achieved "excellent results" for Saint Gobain. Not only did the jury return a verdict in Saint Gobain's favor on the question of infringement, and award the total amount Saint Gobain requested—including full compensatory damages and an amount representing a reasonable royalty--the jury also found that Xinyi acted willfully. The question, thus, becomes what amount represents a "fully compensatory fee?" *Hensley*, 461 U.S. at 435.

"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate [which ...] provides an objective basis on which to make an initial estimate of the value of a lawyer's services." *Hensley*, 461 U.S. at 433. This calculation, known as the "lodestar," serves as the "fairest and most manageable approach to determine an award of attorney fees." *Old Reliable Wholesale, Inc. v. Cornell Corp.,* 2010 U.S. Dist. LEXIS 8756, at *17 (N.D. Ohio Feb. 2, 2010) (citing *Hensley*, 461 U.S.

at 433). *See Lam, Inc. v. Johns-Manville Corp*., 718 F.2d 1056, 1068 (Fed. Cir. 1983) ("In determining the reasonableness of an award [under § 285], there must be some evidence to support the reasonableness of, *inter alia*, the billing rate charged and the number of hours expended.") "The lodestar method is the proper method to use under 35 U.S.C. § 285 and is presumed to be the reasonable fee." *Comark Communs., Inc. v. Harris Corp.*, 1998 U.S. Dist. LEXIS 4036, at *5 (E.D. Pa. Mar. 30, 1998), aff'd, 156 F.3d 1182 (Fed. Cir. 1998).

After a court has determined the lodestar amount, it may make adjustments based on twelve factors:

> the time and labor required; the novelty and difficulty of the questions; the skill requisite to perform the legal service properly; the preclusion of other employment by the attorney due to the acceptance of the case; the customary fee; whether the fee is fixed or contingent; time limitations imposed by the client or the circumstances; the amount involved and the results obtained; the experience, reputation, and ability of the attorneys; the undesirability' of the case; the nature and length of the professional relationship with the client; and awards in similar cases.

*Paschal v. Flagstar Bank, FSB*, 297 F.3d 431, 435 (6th Cir. 2002) (quoting *Blanchard v. Bergeron*, 489 U.S. 87, 91 n.5 (1989)) (numerals omitted). The calculation of attorney's fees is left to the discretion of the district court, and, in reaching its conclusion, the court need not set forth in detail its findings as to each factor. *Healthcall of Detroit, Inc. v. State Farm Mut. Auto. Ins. Co*., 632 F. Supp. 2d 676, 680 (E.D. Mich. 2009).

### Local vs. Specialty Counsel

In utilizing the lodestar approach, the Court begins by determining what a reasonable rate would be. A reasonable rate generally corresponds to the prevailing rates in the relevant community, *see Yamanouchi Pharmaceutical Co. v. Danbury Pharmacal*,

51 F. Supp. 2d at 304, and focuses on the experience, training, and background of the individual attorney. *Louisville Black Police Officers Organization, Inc. v. Louisville*, 700 F.2d 268, 277 (6th Cir. 1983). Generally, the "prevailing market rate [is] defined as the rate that lawyers of comparable skill and experience can reasonably expect to command within the venue of the court of record." *Geir v. Sundquist,* 372 F.3d 784, 791 (6th Cir. 2004) (citing *Adcock-Ladd v. Secretary of Treasury*, 227 F.3d 343, 350 (6th Cir. 2000)).

There is, however, an exception to the general rule that the prevailing market rates of the local community govern the lodestar analysis, and, in this circuit, the exception is known as the "out-of-town specialist." *See Hadix v. Johnson*, 65 F.3d 532, 535 (6th Cir. 1995) (citing *Chrapliwy v. Uniroyal, Inc.*, 670 F.2d 760, 768-69 (7th Cir. 1982)); *Louisville Black Police Officers Org*., 700 F.2d at 278 ("District courts are free to look to a national market, an area of specialization market or any other market they believe appropriate to fairly compensate particular attorneys in individual cases."). Attorneys who specialize in particular fields "such as admiralty law, *patent law*, or antitrust and other complex litigation," tend to charge more for their services and tend to be found in larger cities where the cost of litigation is more expensive. *See Chrapliwy*, 670 F.2d at 769 (emphasis added). When fees are sought for an "out-of-town specialist," "courts must determine (1) whether hiring the out-of-town specialist was reasonable in the first instance, and (2) whether the rates sought by the out-of-town specialist are reasonable for an attorney of his or her degree of skill, experience, and reputation." *Hadix,* 65 F.3d at 535 (citing *Chrapliwy*, 670 F.2d at 768-69). "A corollary of this rule is that judges may question the reasonableness of an out-of-town attorney's billing rate if

there is reason to believe that competent counsel was readily available locally at a lower charge or rate." *Id.* (citing *Chrapliwy*, 67 F.2d at 769.).

Citing *Hadix*, Xinyi complains that Saint Gobain has failed to demonstrate that it attempted to locate competent local patent counsel, and represents that there are any number of local reputable law firms that specialize in intellectual property.[13] (Doc. No. 240 at 4.) *See Hadix*, 65 F.3d at 535. Saint Gobain maintains that it was "prudent" for it to enlist the services of Oblon, Spivak, McCelland, Maier & Neustadt (Oblon Spivak), a D.C. based law firm specializing in intellectual property, not only for their expertise but, also, because Oblon Spivak has worked with Saint Gobain since the early 1980s. In his declaration submitted in support of Plaintiffs' fee petition, Attorney Jean-Paul Lavalleye states that over the last three decades, Oblon Spivak has represented Saint Gobain in several patent litigations throughout the country, including the recent litigation against Fuyao in the Eastern District of Michigan. (Doc. No. 238, Ex. 1, Affidavit of Jean-Paul Lavalleye at ¶ 2.) As a result of this history, Oblon Spivak was already familiar with the patents at issue in this case, as well as the legal issues that formed the basis of the present suit, allowing counsel "to 'hit the ground running' in the Xinyi case and resulted in a significant reduction in attorney fees." (*Id*. at ¶ 3.)

The Court finds that Saint Gobain has demonstrated that it had good reason for using non-local counsel specializing in intellectual property. Not only do the attorneys of Oblon Spivak possess expertise in the area of patent law, but their

---

[13] The Court finds Xinyi's argument that Saint Gobain should have sought out counsel from the local area somewhat disingenuous inasmuch as Xinyi has recently employed D.C. patent counsel to represent it in this matter.

knowledge of Saint Gobain and its patents made Oblon Spivak the obvious choice for counsel. *See, e.g., iLOR LLC v. Google, Inc*., 2009 U.S. Dist. LEXIS 98584, at *16 (E.D. Ky. Oct. 15, 2009) (out-of-state law firm's expertise in patent law and infringement litigation, as well as counsel's familiarity with its client's products, supported the decision to hire non-local counsel notwithstanding the higher hourly rates charged by the non-local firm.)

Unlike the case law relied upon by Xinyi, which involved various civil rights actions,[14] the present case involves the complex and specialized area of patent law which is, "by its very nature, national and not necessarily regional in scope. […]"*iLOR, LLC*, 2009 U.S. Dist. LEXIS 98584, at *17 (approving higher hourly rates of non-local patent counsel). *See Swapalease, Inc. v. Sublease Exchange.com, Inc*., 2009 U.S. Dist. LEXIS 5396 (S.D. Ohio Jan. 27, 2009) (reasonable to employ out-of-town counsel because patent litigation is highly specialized). Moreover, Xinyi's representation to the contrary notwithstanding, the case, itself, was complex. Each side produced multiple experts in the fields of windshield design and installation, as well as economics. The specialized area of law and the complexity of the case, coupled with Oblon Spivak's familiarity with Saint Gobain and its patents, sufficiently support Saint Gobain's selection of non-local D.C. counsel, even though Oblon Spivak comes with a higher price

---

[14] *Pirolozzi v. Stanbro*, 2009 U.S. Dist. LEXIS 124622 (N.D. Ohio Sept. 25, 2009), involved a 42 U.S.C. § 1983 action; *Praseuth v. Rubbermaid, Inc*., 406 F.3d 1245 (10th Cir. 2005), was an employment discrimination claim under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq*.; and *Hadix*, was a prisoner rights case. *See Hadix*, 65 F.3d at 535.

tag.[15]

<u>Reasonable Hourly Rate</u>

Having determined that it was reasonable for Saint Gobain to employ specialty counsel, the Court next explores the reasonableness of the hourly rates charged. Plaintiffs present documentation demonstrating that the hourly rates of associates in Oblon Spivak ranged from $270.00 per hour to $485.00 per hour, with the primary associate billing at between $290.00 and $360.00 per hour. The hourly rates for partners working on this case from the D.C. firm ranged from $475.00 to $795.00 per hour.[16] (Lavalleye Decl. at ¶¶ 21-209.)

Plaintiffs contend that these rates are evidence of the prevailing rates for D.C. patent attorneys. *See Junker v. Eddings*, 396 F.3d 1359, 1365 (Fed. Cir. 2005) ("[T]he amount the client paid the attorney is one factor for the court to consider in determining a reasonable fee [although] it does not establish an absolute ceiling."); *Mathis*, 857 F.2d at 756. Plaintiffs also point to the 2009 American Intellectual Property Law Association (AIPLA) survey, and note that the median rate for partners in 2008 was $590.00 an hour and the median rate for associates was $375.00. According to Plaintiffs, their median rate of $598.00 in 2008 for partners and $325.00 for associates is well in line with the AIPLA rates.

---

[15] In so ruling, the Court rejects Xinyi's argument that counsel's familiarity with Saint Gobain should only be considered with respect to the reasonableness of the number of hours claimed. While the Court agrees that Oblon Spivak's familiarity with Saint Gobain should translate into fewer claimed hours associated with "getting up to speed," this long history can also support Plaintiffs' decision to employ the non-local firm.
[16] Plaintiffs also utilized local counsel in this case. The hourly rates for associates from Thompson Hine ranged from $225.00 per hour to $260.00 per hour. Partners from the local firm billed out at between $340.00 and $400.00 per hour. (Doc. No. 238 at 5, citing Lavalleye Decl. at ¶¶ 140-209.)

Xinyi does not take issue with Saint Gobain's reliance on the AIPLA 2009 survey. *See Mathis*, 857 F.2d at 756 (proper to consider AIPLA survey in determining reasonableness of hourly rates). *See also View Eng'g, Inc. v. Robotic Vision Sys.*, 208 F.3d 981, 987-88 (Fed. Cir. 2000) (affirming district court's award based, in part, on AIPLA survey). Instead, Xinyi complains that Saint Gobain should not have relied on the "Washington, D.C." category, but, rather, should have looked to the "Other Central" region, which would encompass the general area in which this Court sits. Because this Court has already determined that it is appropriate to rely on Washington, D.C. rates, this argument holds no merit.

Nevertheless, the Court finds the AIPLA survey to be not entirely persuasive on account of the incomplete information supplied by Saint Gobain. The AIPLA survey lists hourly rates based on years of experience in intellectual property law. While Plaintiffs have provided the Court with copies of the biographies of the attorneys who worked on this case, these biographies do not disclose the years of experience that each attorney has litigating intellectual property cases.[17] Thus, the Court cannot adequately determine if the hourly rate each attorney has charged is within the AIPLA rates, which are based not only on location, but also on experience.[18] *See Patyk v. Certegy Payment Discovery Servs.,* 2008 U.S. Dist. LEXIS 21538, at *3 (S.D. Cal. Mar. 19, 2008) (quoting *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210-11 (9th Cir.

---

[17] Arthur Neustadt's biography does indicate that he was a "Patent Law Expert" from 1999 to 2005. The Court presumes that this is a distinction in some particular bar and does not encompass Mr. Neustadt's total experience in the area of intellectual property.

[18] The biographies do identify the law school from which each attorney graduated, though no graduation date is offered, and also contain a summary of the the intellectual property cases in which the attorney was involved. This latter category of information does tend to suggest that the attorneys were experienced in litigating intellectual property cases.

1986) ("The Court determines the reasonable rate for *each attorney* by looking at the rate prevailing in the community for 'similar work performed by attorneys of comparable skill, experience, and reputation.") (emphasis added.)[19] *See also United States v. Metropolitan Dist. Com.*, 847 F.2d 12, 19 (citing *Blum v. Stenson*, 465 U.S. 886, 895-96 (1984)) ("[T]he reasonableness of hourly charges depends on prevailing rates in the community for comparably qualified attorneys.")

        The attorney biographies do, however, provide some useful information. The Court can glean from the biographies that many of the Oblon Spivak attorneys who worked on this case have impressive backgrounds in intellectual property, and this is evidence that can be considered in support of the reasonableness of their requested fees. Moreover, from the past litigations listed in each attorney's biographies, it is clear that Oblon Spivak partners and associates alike have considerable experience litigating patent suits. Still, without knowing the years of experience in this area, it is impossible for the Court to compare each rate to the AIPLA rate. Plaintiffs have attempted to get around this deficiency by comparing the average median rate charged for partners and associates and comparing it to the average median rates identified in AIPLA survey. While the Court would have much preferred to have been able to compare each rate attorney by attorney, the Court is satisfied that the survey demonstrates that the rates charged by Oblon Spivak

---

[19] Instead of comparing each lawyer's hourly rate to the AIPLA survey, Plaintiffs take the median of all of the attorneys, delineated only between "partner" and "associate," who worked on the case and compare it to the average of the medians listed in the survey. The Court is unaware of any authority, and Plaintiffs have cited none, that relieves the Court of the responsibility to determine a reasonable rate for *each* attorney. Moreover, this approach completely disregards any recognition of years of experience, which the AIPLA clearly took into account in arriving at its rates
.

in 2008, as a whole, appear to be within the range charged by D.C. patent attorneys for 2008.

Plaintiffs have not, however, offered any supporting evidence to show the reasonableness of attorney rates for time billed in 2006, 2007, 2009, and 2010. Of course, the actual billed rates for these years do provide the Court with some evidence as to reasonableness. *See West v. AK Steel Corp. Ret. Accumulation Pension Plan*, 657 F. Supp. 2d 914, 932 (S.D. Ohio 2009) ("an attorney's customary billing rate is one reliable indicia of that attorney's prevailing market rate") (citing *Hadix*, 65 F.3d at 536 (internal citation omitted) ("normal billing rates 'usually provide an efficient and fair short cut for determining the market rate'"). Still, the lack of corroborating evidence makes the Court reluctant to declare the billed rates to be reasonable. The Court could take a percentage off each rate, or even take a flat dollar amount off, to account for the lack of supporting documentation. *See, e.g., Disabled Patriots of Am., Inc. v. Reserve Hotel*, 659 F. Supp. 2d 877, 893 (N.D. Ohio 2009) (uniform dollar amount reduction to each attorney's hourly rates to ensure reasonableness). However, given the sheer volume of the documents produced, and given the fact that each attorney's rates rose steadily from 2006 and 2010, the Court does not believe that such an approach would be efficient. Because, as will be discussed below, the Court has determined that an across the board reduction in fees is warranted, the Court shall factor into its determination of the appropriate percentage reduction the fact that Plaintiffs failed to fully support the reasonableness of the requested rates.

Reasonable Hours Expended

From the beginning, the Court has been utterly perplexed by Plaintiffs' unwillingness to support their fee petition. Plaintiffs originally supported their motion for attorney's fees solely with the representation that "[t]hrough November 2009, Saint-Gobain incurred approximately $4.0 million in attorney fees." (Doc. No. 224, Ex. 2, Affidavit of Barry Herman at ¶ 5.) Finding that this did not even begin to support such a request, the Court gave Plaintiffs a second opportunity to document their request for fees. (Doc. No. 234.)

In response to the Court's demand for documentation, Plaintiffs supplied 210 pages of billing statements that had been redacted to include nothing more than the attorney's initials, the amount of time billed, and the date on which the unknown billed activity took place. Missing from the billing statements is the description of the work performed. Plaintiffs indicate that they have omitted this vital information in an effort to protect the attorney-client privilege and their counsel's work product. (Doc. No. 238 at 7, n.5.) Instead, Attorney Lavalleye's declaration includes a one-line monthly summary[20] of the work performed by each attorney and the aggregate number of hours billed.

Xinyi contends that Saint Gobain has failed to adequately support the requested hours, and complains that it cannot, based upon the record, evaluate the

---

[20] For example, for February 2007, Mr. Lavalleye provides the total number of hours worked for each attorney for the month and then avers that: "During this period, Mr. Neustadt worked on issues related to the upcoming scheduling conference and substitution of parties and worked on the amended complaint. Mr. McIntyre worked on issues related to the substitution of parties and worked on the amended complaint. Mr. Beverina conducted fact discovery, including identification of other infringing products, conferred with the client and reviewed materials for upcoming scheduling conference." (*Id*. at ¶¶ 32-33.)

reasonableness of Saint Gobain's request. The Court must agree that even Saint Gobain's supplemental submission is inadequate.

Inadequate Documentation

In *Imwalle v. Reliance Med. Prods.*, 515 F.3d 531, 553 (6th Cir. 2008), the Sixth Circuit recognized the importance of accurate documentation in fee petitions:

> The key requirement for an award of attorney fees is that the documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation. Where the documentation is inadequate, the district court may reduce the award accordingly.
>
> ***
>
> Courts in this circuit have reduced attorney fees on the basis of insufficient billing descriptions where the attorney did not maintain contemporaneous records of his time or the nature of his work, and where billing records "lumped" together time entries under one total so that it was impossible to determine the amount of time spent on each task.

(internal citations omitted).

The party seeking attorney's fees bears the burden of proving that the number of hours expended by counsel was reasonable. *See Granzeier v. Middleton*, 173 F.3d 568, 577 (6th Cir. 1999) (citing *Hensley*, 461 U.S. at 433); *Disabled Patriots*, 659 F. Supp. 2d at 884. While "[c]ounsel need not record in great detail each minute he or she spent on an item, the general subject matter should be identified." *Imwalle*, 515 F.3d at 553 (internal citation omitted). "This duty is not limited to submitting the attorney's raw time sheets, but requires that the time records be organized and presented in a manner which will enable the court to value that time." *Codex Corp. v. Milgo Elec. Corp.*, 541 F. Supp. 1198, 1203 (D. Mass. 1982). A failure to provide adequate documentation to support a fee petition may result in a reduction of fees. *See Imwalle,*  515 F.3d at 553

41

(noting that courts in the Sixth Circuit have reduced fees on the basis of insufficient documentation); *PPG Industries, Inc. v. Celanese Polymer Specialties Co.,* 840 F.2d 1565, 1570 (Fed. Cir. 1988) ("insufficient documentation may warrant a reduction in fees").

Plaintiffs' severely redacted billing sheets and summaries fail to set forth the amount of time each attorney spent on any given task. As such, the Court cannot begin to evaluate the reasonableness of any individual entry. *See Proctor & Gamble Co. v. Weyerhaeuser Co.*, 711 F. Supp. 904, 905 (N.D. Ill. 1989) ("No value judgment can be made as to the need for or worth of []time charges" that fail to indicate what an attorney did on any particular day.) Moreover, the one-line summaries provided for each attorney for each month lumps together a number of activities, making it impossible for the Court to determine whether the amount of time expended on each activity was reasonable. *See Leviton Mfg. Co. v. Universal Sec. Instruments, Inc.*, 613 F. Supp. 2d 670, 736 (D. Md. 2008) ("the use of block-billing introduces a level of unreliability in time entries and thus less confidence in the documentation."); *Healthcall*, 632 F. Supp. 2d at 684 (noting the difficulty of evaluating similar one-line summaries).

For example, for the entry for September 2009, it appears that Mr. Herman billed 58.70 hours. The one-line summary indicates that he "worked on expert discovery, worked on motions *in limine*, and worked on proposed voir dire, and worked on trial strategy." (Lavalleye Decl. at ¶ 130.) The Court cannot possibly evaluate the reasonableness of time, which resulted in attorney's fees of more than $31,698.00, without knowing how much time was spent on each of these four tasks, and what these

42

tasks entailed.[21] Plaintiffs' severely deficient documentation warrants a reduction in fees.[22]

<u>Excessive Hours and Duplication</u>

While Xinyi complains that any meaningful analysis of the attorney billing records is not possible, it suggests that these records, though quite inadequate, demonstrate that the hours charged are excessive and redundant. Xinyi notes that the average cost per deposition conducted by Saint Gobain exceeds $100,000.[23] Of course, the Court is aware that several of the depositions in this case were taken in Hong Kong, and that there were language barriers that made taking the depositions a challenge. Without more information, however, the Court cannot evaluate whether the seemingly high cost of taking these depositions was reasonable.

---

[21] Similarly, in October 2009, Mr. Beverina billed 334.3 hours, for a total of $120,000. The one-line summary indicates that he: "prepared for trial, worked on motions in limine and took expert depositions." (Lavalleye Decl. at ¶ 134.) The Court does not know how much time was spent on each task, or even what was involved in each undertaking. As such, the Court cannot determine whether the time Mr. Beverina spent on this case during this month, which Xinyi points out averages about 11 hours a day for the entire month, was well spent.

[22] In their supplemental submission, Saint Gobain invites the Court to engage in an *in camera* inspection of Oblon Spivak's unredacted billing sheets from 2006 until 2010 should the Court find that the redacted records are insufficient. (Doc. No. 238 at 7, n.5.) The Court declines this invitation. Saint Gobain has been afforded two opportunities to provide adequate documentation to support its request for fees, but failed to do so, relying on vague privilege concerns. *See Chaudhry v. Gallerizzo*, 174 F.3d 394, 402 (4th Cir. 1999) ("Typically, the attorney-client privilege does not extend to billing records and expense reports."); *Kwik-Sew Pattern Co. v. Gendron*, 2008 U.S. Dist. LEXIS 74849, at *2 (W.D. Mich. Sept. 25, 2008) ("The assertion that descriptions of work in billing records are protected by attorney-client privilege has generally been rejected."). The Court will not "abdicate the remainder of its judicial responsibilities for an indefinite period," *Cobell v. Norton*, 407 F. Supp. 2d 140, 166 (D.D.C. 2005), to pour over Oblon Spivak's records to finish the job Plaintiffs and their counsel were unwilling to do.

[23] It appears that four attorneys participated in the deposition of Antonio Tam, for a total cost of $120,000. (Lavalleye Decl. at ¶65, noting that this amount also included an undisclosed amount for research.) In February 2008, two attorneys spent nearly $100,000 taking the deposition of Charles Zha and document review. (Lavalleye Decl. at ¶¶ 70-71.) Three attorneys spent approximately $117,000.00 *defending* a deposition in May 2008. (*Id.* at ¶¶ 79-80.) While there may have been justifiable reasons for this expenditure of attorney time and effort, such reasons are not evident from the limited information produced to the Court.

Other examples of potential waste abound. In August 2007 to September 2007, four attorneys billed almost 200 hours on "discovery issues," which included a "discovery dispute." (Lavalleye Decl. at ¶¶ 52-55.) Though it appears that Mr. Beverina also worked on the joint claim construction chart during this time period, the Court has no way of determining whether this staffing was excessive. In July 2009, four attorneys "worked on the opposition to summary judgment" and various other tasks, and billed over 300 hours. (*Id*. at ¶¶ 123-124.) While the Court notes that almost half of the hours were billed by Mr. Beverina, an associate with a comparatively modest billing rate, the Court cannot say that this much attorney attention was warranted.

Across the Board Reduction

Given the vague and incomplete records provided by Saint Gobain, as well as the inadequate billing information found in the one-line summaries, the Court elects to follow the lead of other courts that have applied an across-the-board reduction to account for these deficiencies. The Court finds that a 50% reduction in fees "is a fair and expeditious solution to determining the sum total of reasonable fees [] that [Saint Gobain] has incurred." *Cobell,* 407 F. Supp. 2d at 166. *See, e.g., Procter & Gamble Co*., 711 F. Supp. at 906-09 (reductions in fees between 60% and 90% for inadequate documentation); *Codex*, 541 F. Supp. at 1205 (50% reduction in fees where attorney failed to provide a description of the work performed); *Healthcall*, 632 F. Supp. 2d at 685 (40% reduction in fees to account for inadequate "summaries" of activities). Thus, the Court awards Plaintiffs attorney's fees in the amount of $1,951,296.60.[24] The Court finds

---

[24] Plaintiffs sought a total of $3,902,593.25 in fees: $3,598,676.50 in Oblon Spivak attorney's fees, $227,608.75 in local counsel fees, and $76,308.00 in paralegal fees. (Lavalleye Decl. at ¶ 14.)

that this amount adequately recognizes the excellent result obtain, while ensuring that the charged fees, which were inadequately documented, are not unreasonably excessive.

### IV.    Costs

Plaintiffs also seek to recover $384,882.99 in costs associated with the litigation of this suit. Included within this figure are costs relating to travel to Hong Kong, as well as lodging and food during these trips, copying, scanning, court reporters, interpreter services, and computer research. In support of these expenses, Plaintiffs rely on the billing statements of Oblon Spivak. (Lavalleye Decl. at ¶ 211, Ex. 2, billing statements.) While these redacted statements were sketchy as to fees, the Court finds that the description of the costs contained therein is sufficient for the Court to determine the reasonableness of these costs.[25]

It is understandable that, in a case of this magnitude, substantial costs would be incurred. The litigation lasted for almost 3 years. Along the way, Saint Gobain had to negotiate problems associated with overseas witnesses and language barriers. The case also generated numerous legal issues that undoubtedly required extensive legal research. The record, itself, was considerable, leading to substantial copying and other clerical costs. Having reviewed the billing statements, the Court is confident that these

---

[25] In fact, Plaintiffs go so far as to breakdown the costs by category: (1) total cost of the Hong Kong depositions was $175,657.35; (2 ) the cost of the copying, scanning, and postage was $23,112.88; (3) the cost of court reporters was $38,153.38; (4) the cost of translation and interpreter services was $32,093.72; (4) animation and graphics was $93,299.61; (5) computer research totaled $21,354.20, and (6) the cost for service of process totaled $1,211.85. (Lavalleye Decl. at ¶ 211.)

costs were reasonably incurred during the course of litigation.[26]

      The reasonableness of Saint Gobain's request for cost reimbursement is bolstered by the fact that Plaintiffs are not seeking reimbursement for expert witness fees, which Plaintiffs calculate to be $629,450.49.[27] Such fees are recoverable to a prevailing party in patent litigation, under a district court's inherent power to impose sanctions, "in cases involving bad faith." *Takeda Chem. Indus. v. Mylan Labs., Inc.*, 549 F.3d 1381, 1387 (Fed. Cir. 2008). While the Court makes no determination as to bad faith, Xinyi's willful infringement and vexatious litigation conduct may very well have supported such an award. *See id.* Because Plaintiffs likely would have been entitled to such costs and expenses, the costs actually sought become even more reasonable. The Court hereby awards Plaintiffs $348,882.99 in costs and expenses.

### V.    Prejudgment Interest

      Section 284 of the Patent Act indicates that a court should award interest in patent cases after a finding of infringement. 35 U.S.C. § 284. The Supreme Court has

---

[26] Xinyi's only objection to Saint Gobain's requested costs goes to the fact that Plaintiffs' D.C. counsel incurred travel, and other expenses, by virtue of the fact that they were located outside the Court's judicial district. While the Sixth Circuit has yet to address the question of whether a party may recover for travel time billed by out-of-town counsel, several courts within this district have awarded such costs. *See, e.g., Abu-Hatab v. Siddiqi*, 2009 U.S. Dist. LEXIS 110492, at *17 (E.D. Tenn. Nov. 25, 2009); *Disabled Patriots of Am., Inc. v. Terrace*, 2008 U.S. Dist. LEXIS 73409, at *4 (N.D. Ohio Sept. 25, 2008); *Reserve Hotels,* 659 F. Supp. 2d at 889-90. Given the appropriateness of Saint Gobain's decision to employ D.C. counsel, the Court finds that these expense are also appropriate.

[27] The Court calculates this number to be closer to $493,000.00. Of course, the Court's calculation may not include travel, lodging, and any other expenses that were not broken out in the billing statements. In any event, with the heavy reliance on expert testimony in this case, the Court finds that the expert related fees and costs were understandably considerable. The Court also notes that it found other minor calculation discrepancies. For example, while Mr. Lavalleye calculated computer research expenses at $32,093.72 (Lavalleye Decl. at ¶ 211), the Court's calculation is only $30,745.80. Given the fact that Plaintiffs have already chosen to forego substantial expert witness fees, as well as all fees and costs associated with the preparation of the fee petition, the Court believes that no further deductions are necessary to account for minor accounting errors.

held "that prejudgment interest should be awarded under § 284 absent some justification for withholding such an award." *General Motors Corp.*, 461 U.S. at 657. The interest rate used to calculate prejudgment interest and the method and frequency of compounding is left to the discretion of the district court. *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991).

Prejudgment interest has no punitive purpose. Rather, interest compensates the patent owner for the use of its money between the date of injury and the date of judgment. *Oiness v. Walgreen Co.,* 88 F.3d 1025, 1033 (Fed. Cir. 1996) (citing *Gen. Motors Corp.,* 461 U.S. at 655). Therefore, "[a]lthough the rate of prejudgment interest is left largely to the discretion of the district court, the court must be guided by the purpose of prejudgment interest in exercising that discretion." *Hockerson-Halberstadt, Inc. v. Propet USA, Inc.*, 62 Fed. App'x 332, 334 (Fed. Cir. 2003). As such, prejudgment interest can only be applied to actual damages and not to punitive or enhanced damages. *See Lam, Inc.*, 718 F.2d at 1066.

Xinyi argues that Saint Gobain is not entitled to prejudgment interest because it failed to mark its own products and intentionally delayed in bringing this lawsuit for four years after becoming aware of Xinyi's allegedly infringing activity. (Mem. in Opp. at 20.) While the Supreme Court did not provide an exhaustive list of reasons why prejudgment interest could be withheld, it did state that prejudgment interest could be refused "where the patent owner has been responsible for undue delay in prosecuting the lawsuit." *General Motors Corp.*, 461 U.S. at 657. *See, e.g., Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1362 (Fed. Cir. 2001) (upholding district court's refusal to award prejudgment interest based on

47

plaintiff's strategic delay in bringing suit). However, "absent prejudice to the defendants, any delay by [the patentee] does not support the denial of prejudgment interest." *Lummus Indus., Inc. v. D.M. & E. Corp.*, 862 F.2d 267, 275 (Fed. Cir. 1988).

The record supports an inference that Saint Gobain unduly delayed in bringing suit. Saint Gobain was aware in 2002 that two Chinese glass manufacturers, Fuyao and Xinyi, had entered the market (TR at 469), and that these new competitors were selling after-market windshields with a lip and a bump, similar to the patented products. (TR at 487-88.) Despite this knowledge, it is undisputed that Saint Gobain waited four years to bring suit against Xinyi. Plaintiffs fail to offer any justification (or even explanation) for this substantial delay. Xinyi became aware of Saint Gobain's patents in 2005, when it received a copy of the Fuyao complaint, and it could be argued that the prejudice to Xinyi was minimized at that point. Nonetheless, even disregarding the period after Xinyi received the Fuyao complaint, and even affording a reasonable period of time after the discovery of the potential infringers for investigation, Saint Gobain still cannot account for a substantial delay in bringing suit. Under these circumstances, the Court finds that an award of prejudgment interest is not warranted.

**CONCLUSION**

For all of the foregoing reasons, Saint Gobain's motion for enhanced damages, attorney's fees, and prejudgment interest is **GRANTED**, in part. Saint Gobain is awarded damages totaling $21,888,030.00 as a 100% enhancement of the jury's verdict (a doubling of the award) under 35 U.S.C. § 284, and reasonable attorney's fees totaling $1,951,296.60 under 35 U.S.C. § 285. Saint Gobain is also awarded costs totaling

$348,882.99, but is not awarded prejudgment interest. This case is closed.

**IT IS SO ORDERED**.

Dated: March 31, 2010

_____
HONORABLE SARA LIOI
UNITED STATES DISTRICT JUDGE